UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/30/2019

BBK TOBACCO & FOODS, LLP

Plaintiff,

-against-

GALAXY VI CORP.,

Defendant.

17-CV-4079 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

This is a case about counterfeit rolling papers. Plaintiff BBK Tobacco & Foods, LLP d/b/a HBI International (HBI) makes RAW brand rolling papers and other smoking accessories. It filed this action on May 31, 2017 against eleven defendants, alleging that they were selling counterfeit RAW products at various convenience stores, newsstands, groceries and other small businesses across Manhattan and Brooklyn. Ten of the eleven have settled or defaulted. Now before the Court is plaintiff's summary judgment motion (Dkt. No. 135) against the sole remaining defendant, Galaxy VI Corp. d/b/a Galaxy Wholesale (Galaxy), which operates a smoke supply store in Brooklyn. HBI alleges that Galaxy bought and sold counterfeit RAW rolling papers and trays, thereby violating the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), New York General Business Law (GBL) § 349, and the common law of New York. Plaintiff seeks summary judgment as to liability on all claims, as well as "summary judgment on willfulness" under the Lanham Act, as a predicate to a later motion for statutory damages and attorneys' fees.

For the reasons stated below, plaintiff's motion will be granted with respect to liability under the Lanham Act. However, disputed issues of material fact prevent the entry of summary judgment as to willfulness or as to liability under New York law.

## I.    BACKGROUND

Plaintiff HBI is a limited liability partnership, headquartered in Phoenix, Arizona, that designs, manufactures, imports, markets, and sells RAW brand "smoking products and accessories, including RAW-brand rolling papers." Amend. Compl. (Dkt. No. 27) ¶¶ 6, 23. According to HBI, its rolling papers are used by consumers who prefer to "roll their own" cigarettes, often because such consumers view pre-made cigarettes as "artificial, over-processed, or environmentally unfriendly." *Id*. ¶ 25. RAW brand rolling papers are made in Alcoy, Spain from "high-quality 'raw' ingredients (such as hemp or wood pulp)," and use "minimally processed, unbleached ingredients, which give the rolling papers their characteristic translucent brown color." *Id*. ¶ 30. RAW is also "a lifestyle brand centered around smoking, smoking culture, and the particular culture that consumers of RAW-brand smoking products enjoy." *Id*. ¶ 33.

Defendant Galaxy is a New York corporation with an address at 746 Myrtle Avenue in Brooklyn, New York. Am. Compl. ¶ 13. Although the corporation has existed continuously since 1997, the business at issue in this action – a wholesale smoke supply store operating out of a storefront at the Myrtle Avenue address – began operations in January 2017, and is managed by Said Ghnaim. *See* Ghnaim Dep. Tr. (Dkt. No. 137-16) at 11:23-12:22, 39:2-10, 40:25-41:9.[1]

### A.    Procedural History

HBI filed this action on May 31, 2017, alleging that eleven corporate and individual defendants sold counterfeit RAW rolling papers and related products at their various storefronts.

---

[1] It is not entirely clear who owns the defendant corporation. Ghnaim testified at deposition that he ran the business but his father, Khamis Ghnaim, was the sole owner of the corporation. Ghnaim Dep. Tr. at 12:3-11, 65: 20-22. However, in an affidavit submitted in opposition to the pending summary judgment motion, Said Ghnaim attested, "I am the 23-year-old individual who owns Galaxy VI Corp. . . . and who operates the day-to-day business at our store front location at 746 Myrtle Avenue." Ghnaim Aff. (Dkt. No. 140-1) ¶ 1.

Compl. (Dkt. No. 1) ¶¶ 5, 7-16. On June 22, 2017, HBI filed its Amended Complaint, stating claims for: (1) trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114; (2) false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) deceptive acts and practices in violation of GBL § 349; and (4) common-law trademark infringement, unfair competition, and unjust enrichment. On August 11, 2017, the parties consented to proceed before a United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c). (Dkt. No. 70.) On October 11, 2017, the Court approved a stipulated preliminary injunction prohibiting Galaxy from purchasing or selling counterfeit RAW products. (Dkt. No. 88.) Thereafter, all of the other defendants entered into stipulations of voluntary dismissal (Dkt. Nos. 96-99, 119-122) or defaulted (Dkt. No. 108), leaving Galaxy as the sole defendant.

On September 14, 2018, after discovery, HBI filed its motion for summary judgment against Galaxy, supported by a Memorandum of Law (Pl. Mem.) (Dkt. No. 136), the Declaration of Victoria Danta, one of HBI's attorneys (Danta Decl.) (Dkt. No. 137), and a Rule 56.1 Statement of Undisputed Facts (Pl. 56.1 Stmt.) (Dkt. No. 138).[2] Plaintiff argues that there are no genuine issues of material fact regarding its ownership of valid RAW trademarks or Galaxy's use of confusingly similar marks, Pl. Mem. at 14, because Galaxy "used spurious, counterfeit versions of

_____

[2] Subsection (a) of Local Civil Rule 56.1 requires a party moving for summary judgment to submit "a short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Subsection (b) requires the opposing party to file a statement "responding to each numbered paragraph in the statement of the moving party." Local Civil Rule 56.1(b). The opposing party may also include "additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.* Under subsection (c), the moving party's factual assertions will be "deemed to be admitted" for purposes of the summary judgment motion "unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Subsection (d) states that each factual statement, whether by the moving or the opposing party, "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

the RAW® Trademarks and Trade Dresses on counterfeit rolling papers and trays, precisely for the purpose of confusing consumers and replacing authorized sales of authentic products." *Id*. at 17. Further, according to HBI, Ghnaim "knew he was purchasing and reselling counterfeits," or "at the very least was willfully blind," because he "ignor[ed] glaring red flags that confirmed counterfeiting," such as the "suspiciously low" prices charged by his suppliers; never asked them about their sources, even after being sued herein, *id*. at 22-23; and kept poor records. *Id*. at 24.

In opposition to plaintiff's motion, Galaxy submitted the Declaration and Opposition of Elio Forcina, its counsel (Forcina Decl.) (Dkt. No. 140), together with the Affidavit of Said Ghnaim (Dkt. No. 140-1), and defendant's Response to Statement of Undisputed Material Facts (Def. 56.1 Stmt.) (Dkt. No. 140-2).[3] Ghnaim attests that he "never willfully purchased and distributed inauthentic RAW brand products," explaining that due to his youth and inexperience

---

[3] The Forcina Declaration is a "declaration" only in form. Although arranged in 37 numbered paragraphs over 16 pages, it is manifestly not made on counsel's personal knowledge (and does not purport to be); rather, it consists almost entirely of argument (without any divisions or headings, as required by Local Civil Rule 7.1(a)(2), and without any table of contents or table of authorities, as required by Moses Ind. Practices § 2(h)). The paragraphs devoted to legal argument include a handful of citations to case law. *See* Forcina Decl. ¶¶ 3, 6. However, the paragraphs devoted to factual argument do not include a single citation to either party's Rule 56.1 Statement, the Ghnaim Affidavit, or any other specific item in the evidentiary record of this action, in violation of Fed. R. Civ. P. 56(c)(1). Similarly, defendant's Rule 56.1 Statement is utterly inadequate. Although defendant "admits," "denies," or declares himself unable to admit or deny each factual assertion contained in plaintiff's statement, his denials are not followed by any evidentiary citations, as required by Local Civil Rule 56.1(d) and Moses Ind. Practices § 2(c). Because the Court "endeavors to avoid penalizing parties harshly for the procedural errors of their attorneys," we will overlook the deficiencies of form, and will consider the Forcina Declaration, at least to the extent it articulates a legal argument, and the Ghnaim Affidavit, at least to the extent that it complies with Fed. R. Civ. P. 56(c)(4). *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 453 (S.D.N.Y. 2005). However, "because the statements contained in the [Forcina] Declaration [and defendant's Rule 56.1 Statement] are not supported by citations to admissible evidence and are therefore of minimal helpfulness to the Court, we are left with no choice but to treat as admitted all statements of fact contained in [plaintiff's] Rule 56.1 Statement that are supported and verified by admissible evidence contained in the record." *Lorillard Tobacco*, 378 F. Supp. 2d at 454.

he "was not aware of what the actual market pricing was," saw no "red flags" when suppliers offered him RAW branded products for "better prices" than HBI itself, "didn't have any idea that there [were any] counterfeit RAW products in the market," and "had no way of differentiating between authentic and counterfeit products." Ghnaim Aff. ¶¶ 3, 4, 7, 20. His poor record-keeping, which has prevented HBI from estimating his revenues or profits from counterfeit RAW products, was similarly due to his "lack of experience" rather than any intent to hide bad behavior. *Id*. ¶ 13. Galaxy also argues that plaintiff has no "proof" that it actually sold counterfeit RAW products, Ghnaim Aff. ¶¶ 10-11; Forcina Decl. ¶¶ 10-11, and accuses plaintiff of failing to properly educate its distributors on the risks of counterfeits. Ghnaim Aff. ¶ 21; Forcina Decl. ¶¶ 35-36.

### B.    Facts

The relevant facts are taken from plaintiff's Rule 56.1 Statement and the underlying evidentiary materials to which it cites, and are undisputed unless otherwise noted. Where the evidence is susceptible of more than one interpretation, I have, as required, "resolv[ed] all ambiguities and draw[n] all factual inferences in favor of the party against whom summary judgment is sought." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### 1.    Plaintiff

HBI "designs, manufactures, imports, markets, and sells the 'RAW' brand of smoking products, including rolling papers and accessories like rolling trays." Pl. 56.1 Stmt. ¶ 1. HBI's "RAW" rolling papers come in several varieties, including RAW King Size Slim (RAW KSS) in "Classic," "Organic," and "Black" varieties, which are sold wholesale in 50-pack boxes with 32 paper "leaves" per pack, and cost approximately $38.70 to $40.50 per box. *Id*. ¶¶ 2-3. RAW KSS rolling papers "are subject to strict quality control standards" before they are distributed "to

wholesale stores and retailers throughout the United States." *Id.* ¶ 4. HBI also sells accessories, including rolling trays, which "share design elements with RAW rolling paper packaging" and have a "distinctive look and feel" that "makes the connection to RAW and [HBI] clear to consumers." *Id.* ¶ 6. RAW brand products enjoy "strong consumer brand recognition," in part due to "strong sales and a strong social media presence." *Id.* ¶ 7.

HBI owns the "exclusive rights to a family of registered and common-law RAW® trademarks and trade dresses, which cover a variety of goods and services, including RAW® rolling papers and rolling trays," and have been used continuously and exclusively for this purpose since their first use dates. Pl. 56.1 Stmt. ¶ 8; Kobe Decl. (Dkt. No. 12) Ex. A.[4] HBI also owns "the distinctive common-law 'RAW® KSS Trade Dress,'" which features non-functional design elements such as the "use of colors red, brown and tan," "one or more of the RAW® Trademarks," the terms "KING SIZED SLIM," "AUTHENTIC" and "UNREFINED," "PUREST NATURAL FIBERS" or "PUREST NATURAL HEMP FIBERS," and a "photograph of twine in brown and tan coloring crossing the package vertically and horizontally." Pl. 56.1 Stmt. ¶ 11.

### 2. Defendant

Galaxy sells a variety of RAW products from its storefront on Myrtle Avenue. Pl. 56.1 Stmt. ¶¶ 16, 17, 22. Although it also sells other brands of rolling papers, RAW rolling papers are the most popular. *Id.* ¶ 17; Ghnaim Dep. Tr. at 49:6-12. Galaxy sells a variety of RAW rolling papers, including RAW KSS and RAW 1¼ in both classic and organic varieties, RAW Connoisseur, and RAW 300s. Pl. 56.1 Stmt. ¶ 19; Ghnaim Dep. Tr. at 51:8-15. It also sells RAW

---

[4] HBI's trademark registrations are discussed in more detail in § III(A)(1) below.

rolling machines, RAW filter tips, RAW cases, and RAW rolling trays. Pl. 56.1 Stmt. ¶ 22; Ghnaim Dep. Tr. at 51:20-25.

Prior to opening Galaxy's Myrtle Avenue storefront in January 2017, Said Ghnaim worked as a "jobber," or middleman, selling, among other things, RAW products. Pl. 56.1 Stmt. ¶ 38; Ghnaim Dep. Tr. at 131:11-25. In September 2016, in anticipation of opening the store, Ghnaim made a "preparatory purchase" from My Import Warehouse (My Import), which included two cases (60 boxes) of RAW KSS rolling papers. Pl. 56.1 Stmt. ¶ 28; Ghnaim Dep. Tr. at 141:19-143:18 & Ex. 4. In February 2017, shortly after the store opened, Ghnaim contacted an HBI sales representative and began purchasing RAW products directly from HBI. Pl. 56.1 Stmt. ¶ 27; Ghnaim Dep. Tr. at 56:19-57:15; Danta Decl. Ex. D, at ECF page 19. From May 2017 through December 2017, he also purchased RAW products, including RAW KSS rolling papers, from Metro General Enterprise (Metro General). Pl. 56.1 Stmt. ¶ 31; Ghnaim Dep. Tr. at 115:23-116:4.

Ghnaim never inquired whether his non-HBI sources purchased their RAW products directly from HBI. Pl. 56.1 Stmt. ¶ 34. However, he did check to "mak[e] sure that the product [he] receiv[ed] [came] in a marked case box from RAW," and he used "a bar code scanner app on [his] phone" to ensure that the box was a "legitimate product." Ghnaim Dep. Tr. at 120:15-121:5. Ghnaim stated that he generally looked for the lowest prices per unit available, Pl. 56.1 Stmt. ¶ 33; Ghnaim Dep. Tr. at 120:3-6, and confirmed that he purchased RAW KSS rolling papers from Metro General at prices as low as $22.00 per box (43% below HBI's price for the same product). Pl. 56.1 Stmt. ¶ 37; Ghnaim Dep. Tr. at 279:15-21; Danta Decl. Ex. E, at ECF page 40. In his affidavit, Ghnaim admits that he purchased RAW-branded products from a source (presumably Metro General) that turned out to be "an unauthorized distributor," after "having already purchased from HBI," but he attests that HBI "never informed us, even after the lawsuit began of the

7

authorized and unauthorized dealers of their product." Ghnaim Aff. ¶ 8. Ghnaim attests that he believed the other suppliers' prices were low simply because they could purchase more cases, and thus take advantage of the bulk pricing discounts that HBI was offering. *Id.* ¶¶ 4, 8.

Galaxy did not keep complete records of either the purchase or the sale of RAW products. Pl. 56.1 Stmt.¶¶ 40, 51-54. According to Ghnaim, he sometimes purchased products without receiving a corresponding invoice, and only kept a single hard copy of the invoices he did receive. *Id.* ¶¶ 49-50. Similarly, Ghnaim maintained Galaxy's sales records in hard copy inventory books, and did not keep electronic records or backups of purchase invoices or sales receipts. *Id.* ¶¶ 50-52. Although Galaxy documented its daily sales totals in an Excel spreadsheet, it did not break down the items sold by product, brand, or variety. *Id.* ¶ 54.

### 3.     Counterfeit Sales

Sometime prior to March 2017, HBI hired a private security and investigation firm – LSS Consulting, Inc. (LSS) – to "investigate the manufacture, importation, sale, and other distribution of counterfeit RAW-brand rolling papers, rolling trays, and accessory products in the United States," under the direction of lead investigator John Hood. *See* Hood Decl. (Dkt. No. 11) ¶ 2. LSS sent out private investigators to make "controlled buys" of RAW-brand products, then sent these products to HBI headquarters in Phoenix, Arizona, for "inspection and analysis." *Id.* ¶ 3; Pl. 56.1 Stmt. ¶¶ 41-42.

On March 2, 2017, an LSS investigator purchased one package of RAW KSS rolling papers (Classic variety, $2.00 each) and one RAW-branded rolling tray ($10.00 each) from Galaxy's Myrtle Ave storefront, evidenced by a hand-written receipt. Pl. 56.1 Stmt. ¶ 41; Hood Decl. ¶ 14

& Ex. A.[5] The products were labeled and mailed via Federal Express to lead investigator Hood; and then from Hood to HBI headquarters in Arizona, where HBI's Creative Director, Ian Kobe, analyzed the trademarks and trade dress of the purchased products. Hood Decl. ¶ 15; Kobe Decl. ¶¶ 2, 46-50. Kobe determined that the products sold by Galaxy were counterfeit because they contained one or more of the following "telltale signs:" (a) "[m]istakes in letter tracking"; (b) "[g]enerally poor printing and paper quality"; (c) "[i]ncorrect coloring/over saturation of the product packaging"; (d) "[i]ncorrect fonts"; and (e) "[i]ncorrect watermarks on the papers themselves." Pl. 56.1 Stmt. ¶ 44; Kobe Decl. ¶ 45. Additionally, the RAW rolling tray sold by Galaxy to the LSS investigator had pronounced round corners, whereas the authentic tray in the same size had "slightly rounded corners." Pl. 56.1 Stmt. ¶ 44; Kobe Decl. ¶ 49.

As noted above, Galaxy continued to purchase RAW branded products from a supplier other than HBI itself after this lawsuit was filed, *see* Ghaim Aff. ¶ 8, and even after Galaxy entered into the stipulated preliminary injunction on October 11, 2017. In discovery, Galaxy produced purchase invoices from Metro General dated October 17, November 29, and December 7, 2017, which included RAW products. Danta Decl. ¶ 13 & Ex. D (Dkt. No. 137-4), at ECF pages 39, 40, 43. However, there is no evidence in the record of this action that the products corresponding to these invoices were counterfeit.

---

[5] Exhibit A to the Hood Declaration is a photograph showing the products that the investigator bought from Galaxy alongside the receipt for those products, which is dated 3/2/17. As discussed in more detail in § III(A)(2), below, Galaxy denies that the 3/2/17 sale ever took place, Forcina Decl. ¶ 25, based on Ghnaim's statement that he did not usually provide receipts to "retail customers" and that the 3/2/17 receipt was not in his handwriting. Ghnaim Aff. ¶ 10. However, another copy of the same receipt was produced by Galaxy in discovery, under cover of a letter from attorney Forcina. *See* Danta Decl. ¶ 17 & Ex. H (Dkt. No. 137-9), at ECF page 28. Galaxy has therefore failed to raise a triable issue of fact as to the provenance of the receipt.

## II.     LEGAL STANDARDS

### A.     Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128-29 (2d Cir. 1996). The party moving for summary judgment bears the burden of showing the absence of any genuine dispute of material fact by citing to admissible evidence in the record. Fed. R. Civ. P. 56(a), (c); *Adickes v. S.H Kress & Co.*, 398 U.S. 144, 157 (1970).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to establish a genuine dispute of fact. *Beard v. Banks,* 548 U.S. 521, 529 (2006); *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir. 2001). The non-moving party may not avoid summary judgment by "relying solely on conclusory allegations or denials that are unsupported by facts." *Garcia v. JonJon Deli Grocery Corp.*, 2015 WL 4940107, at *2 (S.D.N.Y. Aug. 11, 2015) (citing *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002)). Instead, the non-moving party "must set forth 'specific facts showing that there is a genuine issue for trial.'" *Id*. at *2 (quoting *Celotex*, 477 U.S. at 324).

When considering a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Thus, "the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. The inferences to be drawn from the underlying affidavits, exhibits,

interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin*, 46 F.3d at 202 (citations omitted).

At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The trial court's responsibility is 'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.'" *Cornigans v. Mark Country Day Sch.*, 2006 WL 3950335, at *3 (E.D.N.Y. July 12, 2006) (quoting *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 522 (2d Cir. 1996)), *report and recommendation modified on other grounds, J.C. v. Mark Country Day Sch.*, 2007 WL 201163 (E.D.N.Y. Jan. 23, 2007). In other words, the court need only "determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Shapiro v. Kronfeld*, 2004 WL 2698889, at *8 (S.D.N.Y. Nov. 24, 2004) (quoting *Anderson*, 477 U.S. at 251-52). "[S]ummary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, 'there can be but one reasonable conclusion as to the verdict.'" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 250). *See also Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009)) ("[s]ummary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit").

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). *See also* Local Civ. R. 56.1(d) (each statement by a party of a fact as to which that party contends that there is, or is not, a genuine issue to be tried must be followed by a citation to evidence "which would be admissible,"

11

as required by Fed. R. Civ. P. 56(c)). However, "documents inadmissible under the evidence rules may be considered by the court if not challenged." 10A Wright, Miller, & Kane, *Federal Practice & Procedure* § 2722, at 400 (4th ed.); *accord Capobianco v. City of New York*, 422 F.3d 47, 55-56 (2d Cir. 2005) (where "unsworn letters" were submitted by defendants as part of their summary judgment moving papers, defendants "waived any objections" to their admissibility, thus permitting plaintiff to rely on them in opposition to the motion); *accord A.A.B. Joint Venture v. United States*, 77 Fed. Cl. 702, 706 (2007); *Jackson v. City of New York*, 2011 WL 1533471, at *9 (E.D.N.Y. Mar. 3, 2011), *report and recommendation adopted sub nom. Jackson v. New York*, 2011 WL 1527935 (E.D.N.Y. Apr. 22, 2011); *Watson v. Long Island R.R. Co.*, 500 F. Supp. 2d 266, 269 n.5 (S.D.N.Y. 2007).

## B. The Lanham Act

The Lanham Act protects both registered and unregistered trademarks, as well as trade dress. *See* 15 U.S.C. § 1114(1)(a)-(b) (protecting registered trademarks from, among other things, unauthorized use in commerce); 15 U.S.C. § 1125(a)(1)(A) (protecting unregistered marks by imposing liability for the commercial use of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake"). Courts analyze trademark infringement claims brought under either provision using a two-step test that asks, "first whether the mark 'merits protection' and, second, whether the allegedly infringing use of the mark (or a similar mark) is likely to cause consumer confusion." *Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44, 47 (2d Cir. 2017), *as amended* (Oct. 4, 2017) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012) (internal quotations omitted)).

If the allegedly infringed mark is registered, "[t]he first prong is satisfied by showing that [it] is valid and registered, owned by the registrant, and that the registrant has the exclusive right to use the mark in commerce." *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018). A plaintiff may satisfy this standard by producing a valid certificate of registration. *Id*. (citing *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999)). "When a plaintiff sues for infringement of its registered trademark, the defendant bears the burden to rebut the mark's protectability." *Id*.

If the allegedly infringed mark is unregistered, "the burden is on plaintiff to prove that its mark is a valid trademark." *Franklin v. X Gear 101, LLC*, 2018 WL 3528731, at *11 (S.D.N.Y. July 23, 2018) (quoting *Reese Publ'g Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980)), *report and recommendation adopted,* 2018 WL 4103492 (S.D.N.Y. Aug. 28, 2018). To determine whether a mark is entitled to protection, the court must assess whether a mark is generic, descriptive, suggestive, arbitrary, or fanciful. *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 441 (S.D.N.Y. 2017) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)). "Suggestive and arbitrary or fanciful marks are considered inherently distinctive and protected, but a descriptive mark will be protected only if it has acquired secondary meaning." *Id*. (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993)). A secondary meaning is one "that consumers associate with a single source, even though the source itself may be unknown." *Gruner + Jahr USA*, 991 F.2d at 1076.

The protections afforded to unregistered trademarks under 15 U.S.C. § 1125(a) also extend to trade dress. *L'Oreal USA, Inc. v. Trend Beauty Corp.*, 2013 WL 4400532, at *19 (S.D.N.Y. Aug. 15, 2013). Trade dress "encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the

consumer." *Id.* (quoting *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997)). A product's trade dress is entitled to protection if it is non-functional, and if it is "either inherently distinctive or has acquired distinctiveness through secondary meaning." *Coty*, 277 F. Supp. 3d at 441 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)). "In the context of packaging, . . . because 'the varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited . . . a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for [§ 1125(a)] protection.'" *L'Oreal USA*, 2013 WL 4400532, at *20 (quoting *Fun-Damental Too*, 111 F.3d at 1001).

Once a mark has been found to "merit protection," courts in this Circuit apply the eight-factor balancing test described in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) to determine whether the alleged infringement is likely to cause confusion. *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016). The *Polaroid* factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Id.* (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)).

However, where the alleged infringement involves counterfeit goods, a detailed analysis of the *Polaroid* factors is unnecessary. *See Topps Co., Inc. v. Gerrit J. Verburg Co.*, 41 U.S.P.Q.2d 1412, 1417 (S.D.N.Y. 1996) (in counterfeit cases, where "the marks are identical, and the goods are also identical and directly competitive, the decision can be made directly without a more formal and complete discussion of all of the *Polaroid* factors"). This is "because counterfeits, by their

very nature, cause confusion." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287-88 (S.D.N.Y. 2003). Thus, the fundamental questions in determining liability in counterfeiting cases is "whether the items at issue [] are, in fact, counterfeit and whether Defendants sold those items." *Id. See also Spin Master*, 325 F. Supp. 3d at 422 ("The sale of counterfeit goods is sufficient use to establish liability.").

The Lanham Act is a strict liability statute. *Spin Master*, 325 F. Supp. 3d at 421. Therefore, "wrongful intent is not a prerequisite to an action for trademark infringement or unfair competition [under the Lanham Act], and [] good faith is no defense." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004). However, once liability is established, an infringer's intent is a factor in determining damages. The ordinary measure of recovery for trademark infringement is an award of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). However, if the defendant "intentionally us[ed] a mark or designation, knowing such mark or designation is a counterfeit mark . . . , in connection with the sale, offering for sale, or distribution of goods or services," 15 U.S.C. § 1117(b)(1), the court shall "enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee." 15 U.S.C. § 1117(b).

Because "counterfeiters often maintain sparse business records," making it difficult for victorious plaintiffs to recover actual damages, the Lanham Act allows plaintiffs to recover statutory damages as an alternative to actual damages. 15 U.S.C. § 1117(c); *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 110 (2d Cir. 2012). Where, as here, a party elects to seek statutory damages, *see* Pl. Mem. at 25, the statute provides for an award of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1). However, if "the court

finds that use of the counterfeit mark was willful," it may increase the statutory damages to "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(2).

Regardless of the plaintiff's selected damage remedy, an award of attorney's fees is available in "exceptional cases." *Louis Vuitton Malletier*, 676 F.3d at 111. Willful infringement by itself does not entitle a plaintiff to recover attorney's fees. *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 216 (2d Cir. 2019). Rather, to determine whether the case is "exceptional," so as to merit an award of attorney's fees, courts must "engage in a 'case-by-case exercise of their discretion, considering the totality of the circumstances' in determining whether the case is 'one that stands out from others.'" *Id*. (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 134 S.Ct. 1749, 188 L.Ed.2d 816 (2014)).

To prove the requisite willfulness required for heightened damages, "plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness." *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) (quoting *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005)). "Willful blindness" in the context of trademark infringement "means that a defendant knew it might be selling infringing goods but nevertheless 'intentionally shielded itself from discovering' the truth." *Id*. (quoting *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 109 (2d Cir. 2010)).

## C. Unfair Competition Under New York Common Law

The same standards that govern a Lanham Act claim apply to a claim of unfair competition under New York common law, "except common law requires a showing of bad faith or intent." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 598

(S.D.N.Y. 2010), *amended on reconsideration* (Mar. 23, 2010). *See also Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997) ("[Plaintiff's] state law claim of unfair competition is not viable without a showing of bad faith."). This is because "[t]he essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another. Central to this notion is some element of bad faith." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980). *See also Ivy League Sch., Inc. v. Danick Indus., Inc.*, 44 Misc. 3d 1223(A), 999 N.Y.S.2d 797 (Table) (N.Y. Sup. 2014) (slip opinion) ("New York's common law unfair competition claim does, however, require the element of bad faith or intent to deceive on the part of the defendant which is not required by the federal statutory claim.").

Several courts have held that "use of a counterfeit mark creates a presumption of bad faith." *Fendi Adele v. Burlington Coat Factory*, 689 F. Supp. 2d at 599; *see also Spin Master*, 325 F. Supp. 3d at 424 (listing cases). However, this presumption of bad faith only attaches where defendants were aware of the counterfeiting. *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 158 (E.D.N.Y. 2016) ("If use of counterfeits alone were enough to establish liability – regardless of a defendant's intent or knowledge – unfair competition claims under New York common law would be rendered indistinguishable from strict liability Lanham Act claims."). *See also Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987) ("[A]wareness [that a mark is in use] can give rise to an inference of bad faith."); *Philip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004) ("the evidence [plaintiff] proffers to demonstrate [defendant's] *intentional* use of the counterfeit marks . . . also serves to establish [defendant's] bad faith under New York common law") (emphasis added).

17

## D.    New York General Business Law § 349

GBL § 349 makes unlawful all "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a). To establish a claim under § 349, a plaintiff "must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 611 (2000). Regardless of the deceptive act, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Mayes v. Summit Entm't Corp.*, 287 F. Supp. 3d 200, 208 (E.D.N.Y. 2018) (quoting *Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*, 2009 WL 4857605, at *7 (S.D.N.Y. Dec. 14, 2009).

"A non-consumer plaintiff bringing a claim under Section 349 must allege that the defendant's actions 'harmed consumers or the public interest in [a] material respect.'" *Mayes*, 287 F. Supp. 3d at 205 (quoting *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 323 (S.D.N.Y. 2010)). Thus, trademark infringement claims are not cognizable under § 349 "unless there is a specific and substantial injury to the public interest over and above the ordinary trademark infringement." *Diesel S.P.A. v. Does*, 2016 WL 96171, at *8 (S.D.N.Y. Jan. 8, 2016) (quoting *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 2015 WL 5507147, at *18 (S.D.N.Y. Sept. 18, 2015)); *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 543 (S.D.N.Y. 2012); *Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, 2010 WL 2133937, at *6 (E.D.N.Y. Mar. 11, 2010) (collecting cases), *report and recommendation adopted,* 2010 WL 2160058 (E.D.N.Y. May 27, 2010). This is because "confusion and deception of the consuming public . . . [are] not distinct from the very harm that trademark laws generally seek to redress," and therefore are "not over and above ordinary trademark infringement." *Coach, Inc. v. Horizon Trading USA*

*Inc.*, 908 F. Supp. 2d 426, 436 (S.D.N.Y. 2012) (internal quotations omitted). *See also DePinto v. Ashley Scott, Inc.*, 222 A.D.2d 288, 289, 635 N.Y.S.2d 215, 217 (1st Dep't 1995) (affirming dismissal of § 349 claims based on theories of trademark infringement and unfair competition because those claims did "not pose a significant risk of harm to the public health or interest").

## III.    ANALYSIS

### A.    Trademark Infringement

Applying the two-step test for analyzing trademark infringement, *see Victorinox*, 709 F. App'x at 47, we find that there is no genuine dispute but that Galaxy's purchase and sale of counterfeit RAW products violated the Lanham Act.

### 1.    Plaintiff Has Established that its RAW Trademarks and RAW KSS Trade Dress Merit Protection

HBI has established that its RAW trademarks and RAW KSS trade dress are entitled to protection under the Lanham Act. It submitted five registration certificates that confirm the validity of its registered marks, including the word RAW in connection with "cigarette rolling papers made from processed paper, plastic, or metal hand held cigarette rolling machines" (U.S. Registration No. 2,909,221); the word RAW in connection with, among other things, cigar lighters, cigarette lighters, paper rolling cases, and paper rolling trays (U.S. Registration No. 4,412,202); the words RAW ARTESANO, for "cigarette rolling papers, cigarette filters, and cigarette rolling trays" (U.S. Registration No. 4,325,822); and the RAW logo and package design (U.S. Registration Nos. 3,422,929 and 4,647,824). Pl. 56.1 Stmt. ¶ 9; Kobe Decl. ¶¶ 25, 35-36, Ex. A. "[A] certificate of registration, once issued, is *prima facie* evidence that the registered mark is valid." *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 562 (2d Cir. 1990). Moreover, Galaxy does not submit any evidence to refute the protectability of any of HBI's registered marks. *See Lane Capital Mgmt.*,

192 F.3d at 345 ("[W]hen a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of [the] mark's protectability by a preponderance of the evidence.").

In addition, HBI has adequately demonstrated that its unregistered RAW KSS trade dress is inherently distinctive and non-functional, *see* Kobe Decl. ¶¶ 34-38, and "make[s] the connection between RAW® and HBI clear to consumers," Pl. 56.1 Stmt. ¶ 13, such that the trade dress has also developed a "secondary meaning." *See Fun-Damental Too*, 111 F.3d at 999 (to prevail on a trade dress claim, the plaintiff must "demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning," and in the case of inherent distinctiveness that the trade dress is "nonfunctional") (emphasis added). For example, the RAW KSS packaging contains distinct colors and phrases associated with the RAW brand, as well as protected elements such as the RAW logo and the raster image of twine encasing the package. *See* Pl. 56.1 Stmt. ¶¶ 11-13; Kobe Decl. ¶¶ 37-40, Ex. B. Even if some elements of the RAW KSS packing are generic or descriptive, the overall look is distinct and calls to mind the RAW brand name, entitling it to protection. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995) ("Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry."). Therefore, plaintiffs have established that their RAW KSS trade dress merits protection. *See Coty*, 277 F. Supp. 3d at 443 (plaintiff's "unregistered trade dresses all consist of original, detailed, and specific fragrance packaging combinations, and thus merit trade dress protection"); *L'Oreal USA*, 2013 WL 4400532, at *20 (packaging for fragrances was arbitrary or fanciful and merited trade dress protection because the boxes were different sizes and colors, "adorned with

distinct designs and borders," and "the name of the fragrance is displayed in different fonts and sizes").

### 2. Plaintiff has Established that Defendant Sold Counterfeit RAW Products

Because the alleged infringement involved counterfeit goods, HBI must show that the goods were in fact counterfeit and were sold by Galaxy. *Gucci Am.*, 286 F. Supp. 2d at 288. "A product is deemed counterfeit if it contains an original mark that is likely to deceive the public as to its origin." *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 169 (S.D.N.Y. 2007). No separate proof of consumer confusion is required if, as alleged, "the marks are identical, and the goods are also identical and directly competitive." *Topps Co.*, 41 U.S.P.Q.2d at 1417.

Here, the products purchased by HBI's investigator bore marks and trade dress so nearly identical to the marks and trade dress used on authentic RAW products as to require close analysis by HBI's creative director to spot the differences. *Compare* Hood Decl. Ex. A (photograph of product purchased from Galaxy by plaintiff's investigator) *with* Kobe Decl. Ex. B (photographs of authentic RAW products). Kobe attests that, after performing that analysis on the rolling papers and tray purchased from Galaxy on March 2, 2017, he found "telltale signs" of counterfeiting in their lettering, printing and paper quality, colors and saturation. Kobe Decl. ¶ 45. Additionally, Kobe explains, the corners of the rolling tray sold by Galaxy were more rounded than the authentic RAW trays, which was further evidence that the tray sold by Galaxy was counterfeit. Kobe Decl. ¶ 46; Pl. 56.1 Stmt. ¶ 44.

These subtle differences and "telltale signs" would not, of course, be obvious to consumers; that is the point of counterfeiting. Thus, plaintiff has demonstrated that the RAW marks and trade dress on the products sold by Galaxy to plaintiff's investigator were counterfeits, *see Motorola,*

*Inc. v. Abeckaser*, 2009 WL 962809, at *7 (E.D.N.Y. Apr. 8, 2009) (inspection of goods by Motorola's Manager of Quality, who determined that the goods in question were counterfeit, *inter alia*, because of their inferior quality and inconsistent packing, was enough to establish that defendants sold counterfeit products); *Gucci Am.*, 286 F. Supp. 2d 284, 288 (S.D.N.Y. 2003) (plaintiff established that the goods were counterfeit where its quality control expert identified several deviations in the each of the products in question, plaintiff accounted for the chain of custody from the sellers to the expert, and defendants produced no evidence to refute the expert's claims), and that they were "likely to deceive the public as to [their] origin." *Cartier*, 512 F. Supp. 2d at 169.

HBI has also established that its investigator purchased the counterfeits – one package of counterfeit RAW KSS Classic rolling papers and one counterfeit RAW rolling tray – from Galaxy's store on Myrtle Avenue on March 2, 2017. Pl. 56.1 Stmt. ¶ 41; Hood Decl. ¶ 14, Ex. A. HBI submitted an affidavit from the lead investigator, Hood, together with documentary evidence tracing the chain of custody of the counterfeit goods – from the purchaser, to Hood, to Kobe, who made the ultimate determination that the goods were counterfeit. Pl. 56.1 Stmt. ¶¶ 41-43; Hood Decl. Ex. A. *See also Gucci Am.*, 286 F. Supp. 2d at 288 (granting summary judgment to Gucci where its expert, Chiarelli, explained "the bases for his conclusion that the five items in question are counterfeit" and plaintiff "accounted for the chain of custody of the items from the sellers to Chiarelli").

Galaxy, for its part, denies that it sold any products, let alone the counterfeit goods, to the HBI investigator on March 2, 2017. Ghnaim Aff. ¶ 10. However, the only evidence offered in support of that denial is Ghnaim's attestation that it was not his personal practice to give hand-written receipts to retail customers and that the receipt offered by plaintiff was not in his

handwriting. Ghnaim Aff. ¶ 10. He does not explain how a copy of the same receipt also turned up in Galaxy's document production, *see* Danta Decl. Ex. H, at ECF page 28, along with numerous other handwritten receipts, at least some of which appear to be in the same handwriting as the investigator's receipt. *See*, *e.g.*, *id.* at ECF page 29 (handwritten receipt to "Jacob Franklin" for, *inter alia*, RAW products). Even giving a favorable inference to Ghnaim's claim that he personally did not write out the receipt in question, his affidavit fails to raise a material issue of fact as to whether Galaxy sold the counterfeit products to HBI's investigator.

Since Galaxy has not submitted any admissible evidence that would rebut plaintiff's proof as to the purchase of the counterfeits from its Myrtle Avenue store – or any of the other elements of plaintiff's liability case – it has not shown there are any genuine facts in dispute regarding its liability for trademark infringement and false designation of origin under §§ 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and § 1125(a). *See Lorillard Tobacco*, 378 F. Supp. 2d at 456. Plaintiff is therefore entitled to summary judgment as to liability on these claims.

### 3. Plaintiff Has Not Established that Defendant's Conduct was Willful

Although HBI has established Galaxy's liability under the Lanham Act, it has not established that the infringement was the result of intentional or willful conduct. To prove that Galaxy's infringing conduct was willful, HBI must show that Galaxy knew that it was selling counterfeit goods or recklessly disregarded evidence that the products were counterfeit. *Fendi Adele v. Ashley Reed Trading*, 507 F. App'x at 31. In this Circuit, "Courts have insisted on a relatively egregious display of bad faith for a finding of willfulness." *Mele v. Davidson & Assocs., Inc.*, 2004 WL 2285111, at *13 (W.D.N.Y. Oct. 7, 2004). Thus, in cases where willfulness has been found, there is generally a pattern of past bad conduct on the part of defendants, such as

arrests or other lawsuits, or a direct relationship with the manufacturer of the counterfeit goods. *See, e.g.*, *Fendi Adele v. Burlington Coat Factory*, 689 F. Supp. 2d at 600 (finding willfulness where defendant failed to comply with an injunction issued during a prior lawsuit with plaintiff, failed to follow its own procedures designed to prevent the purchase and sale of counterfeit goods, and continued to buy and sell counterfeit products even after plaintiff had sent a second round of cease and desist letters to defendant); *Telebrands Corp. v. HM Imp. USA Corp.*, 2012 WL 3930405, at *5 (E.D.N.Y. July 26, 2012) (finding willful infringement "particularly appropriate where, as here, the same defendant had been previously sued for similar violations, yet failed thereafter to take steps to avoid infringing the intellectual property rights of others"), *report and recommendation adopted,* 2012 WL 3957188 (E.D.N.Y. Sept. 10, 2012); *Phillip Morris USA Inc. v. Marlboro Express*, 2005 WL 2076921, at *6 (E.D.N.Y. Aug. 26, 2005) (finding willful infringement where defendant had "recently pled guilty to knowingly and intentionally conspiring to traffic counterfeit cigarettes" and because of the size of defendant's operation, which involved "at least 200,000 cartons and millions of cigarettes"); *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 167 (S.D.N.Y. 1999) (finding willful infringement where defendants expressly designed and marketed their products as Coach "look-a-likes" and could correlate their products to corresponding products in the Coach catalogue).

Even where courts have found "willful blindness," the defendants generally were the subjects of prior infringement lawsuits or received cease and desist letters from the plaintiffs but continued to sell the counterfeit product, or failed to take steps to adequately protect its supply. *See*, *e.g.*, *Fendi Adele v. Ashley Reed Trading,* 507 F. App'x at 31-32. (infringement deemed willful or the result of "willful blindness" where defendants were the subjects of earlier lawsuits and cease and desist letters from plaintiffs and other designers, and were therefore on notice about

24

possible infringement, but "failed to adequately inquire about the authenticity and original sources of the goods they purchased," "failed to maintain records of their transactions with suppliers," and returned the merchandise in question "rather than allowing it to be inspected"); *Lorillard Tobacco*, 378 F. Supp. 2d at 453-54 (finding, at minimum, "willful blindness" where there was testimony that defendant purchased cigarettes from an unaffiliated vendor who sold cigarettes out of a "garbage bag").

HBI has no direct evidence of intentional infringement and thus relies on a willful blindness theory, arguing that Galaxy "willfully bought and sold counterfeit RAW® products" by "ignoring glaring red flags that confirmed counterfeiting." Pl. Mem at 22. Although HBI has marshalled a variety of circumstantial evidence that Galaxy knew or should have known that it was selling counterfeit goods – the low prices charged by its suppliers, the cash transactions with those suppliers, and Galaxy's shoddy record-keeping – in each instance there are also potentially innocent explanations for defendant's conduct. Moreover, plaintiff has offered no evidence that Galaxy was aware of the counterfeiting prior to this lawsuit. Unlike the cases discussed above, there is no evidence in the record now before the Court that HBI previously sued Galaxy or even sent cease and desist letters before it filed suit. *Cf. Fendi Adele v. Burlington Coat Factory*, 689 F. Supp. 2d at 600 (citing *Motorola*, 2009 WL 962809, at *7) ("Courts have repeatedly found willfulness where a defendant receives a cease and desist letter but continues the infringing conduct."). Nor is there any evidence that HBI routinely alerted its vendors to possible counterfeiting in their area, published a list of known sources of counterfeiting, or even provided vendors with the means to identify authorized HBI wholesalers.

The cases that HBI cites in support of its willful blindness argument all involve significantly more sophisticated defendants, most of whom also had histories of being sued for

trademark infringement. *See*, *e.g.*, *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 850-52 (2d Cir. 1995) (defendants were importers of "brand-name goods, 'off-brand-name' goods, and 'closeouts'" who, "by virtue of their involvement in prior 'gray goods' litigation, were aware of the potential problems when brand-name merchandise is purchased from an off-shore source"), *abrogated on other grounds by 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202 (2d Cir. 2019); *Fendi Adele v. Ashley Reed Trading*, 507 F. App'x at 31 (defendant was "clearly on notice that it might be infringing trademarks after [plaintiff's] 2001 cease and desist letter and multiple lawsuits filed by other designers in 2000 and 2001"). In contrast, Galaxy's smoke supply store is a small operation, run by a young manager with no known history of trademark infringement or litigation experience, and had only been in business a few months at the time of the lawsuit. The courts are – appropriately – reluctant to summarily adjudicate such a defendant as a "willful" violator of federal law. *See*, *e.g.*, *Danone Asia Pte. v. Happy Dragon Wholesale, Inc.*, 2006 WL 845573, at *8 (E.D.N.Y. Mar. 29, 2006) (denying summary judgment as to damages where there was no evidence that defendant knew he was selling counterfeit soy sauce and disputed facts regarding his willful blindness).

Plaintiff claims that because Galaxy purchased RAW products from vendors other than HBI, it should have known that those sources were disreputable and accepted the risk that their products could be counterfeit. Pl. Mem. at 5; Pl. 56.1 Stmt. ¶¶ 26-27, 30-31. It is undisputed that in September 2016, months before opening the storefront on Myrtle Avenue (and before making its first purchase from HBI on February 6, 2017), Galaxy made a "preparatory purchase" from a wholesaler called My Import, which sold Galaxy 60 boxes of RAW KSS rolling papers for $28.50 per unit, $10.00 less per unit than HBI's price. Pl. 56.1 Stmt. ¶¶ 29-30; Ghnaim Dep. Tr. Ex. 4. However, Ghnaim testified that this was the only purchase he made from My Imports, Ghnaim

Dep. Tr. at 115:18-22, and plaintiff has no contrary evidence. Moreover, it is not clear whether Ghnaim knew, at that point, what HBI would have charged for the same product. *See* Ghnaim Dep. Tr. at 56:22-57:15 (explaining that the first time he heard of HBI was in 2017, when he Googled "RAW distributors" and then "reached out to one of their sales reps").

It is also undisputed that Galaxy purchased RAW products from May through December 2017 from Metro General – which according to Ghnaim was the only other source of RAW products for Galaxy besides My Import and HBI. Danta Decl. Ex B, at ECF pages 21-40; Ghnaim Dep. Tr. at 115:23-116:4. By this time Ghnaim knew what plaintiff charged, having purchased directly from HBI beginning in February 2017. Danta Decl. Ex D, at ECF page 19. Plaintiff contends that because Metro General charged lower prices than it did – and only accepted payments in cash – Galaxy should have known that there was a risk that it was purchasing counterfeit products. Pl. Mem. at 22-23.

According to Ghnaim, however, the wholesale smoking products industry is competitive and many suppliers have "cash and carry" policies to avoid losing money by extending credit to (or even accepting checks from) their customers. Ghnaim Aff. ¶ 9. Ghnaim also testified that, as he understood it, certain distributors had seniority in the market and therefore could purchase higher quantities from HBI at lower prices than he was able to do – passing along the savings to him. Ghnaim Dep. Tr. at 116:13-19. Furthermore, Ghnaim testified – and HBI has not disputed – that HBI had a minimum purchase amount that Galaxy could not always afford, forcing him to seek out other sources of its product. Ghnaim Dep. Tr. at 116:19-117:5.

Metro General may or may not have been selling counterfeit RAW products. But there is no evidence before the Court that it sold such products to Galaxy, nor that Galaxy resold them. As noted above, HBI has established only one sale of counterfeit RAW products by Galaxy, which

took place on March 2, 2017 – two months after the opening of Galaxy's storefront business and two months before its first documented purchase from Metro General. In order to obtain summary judgment on willfulness, therefore, plaintiff must establish that Galaxy knew that it was selling counterfeit goods on March 2, 2017, or that it recklessly disregarded evidence of counterfeiting that was available to it on or before that date. *Fendi Adele v. Ashley Reed Trading*, 507 F. App'x at 31. Thus, Galaxy's post-March 2, 2017 purchases from Metro General are irrelevant to plaintiff's willfulness claim.

HBI points to numerous examples of Galaxy's poor record keeping and lackadaisical discovery responses as further evidence that Galaxy's conduct was willful. Pl. Mem. at 24-25. HBI is correct that in certain cases failing to keep good records and obstructing discovery has been used to support an inference of willful infringement. *See*, *e.g*., *Bambu Sales*, 58 F.3d at 854 (court issued default judgment against defendant accused of willful infringement after defendant failed to comply with an order compelling production of documents that other records proved were in his possession, and engaged in a pattern of "tactical obstruction" for almost 18 months). But poor record keeping by a young business manager with two months of experience at the time of the counterfeit sale (and a little over a year at the time of his deposition) does not permit the same inference, and therefore provides little support for the summary judgment of willfulness that plaintiff seeks.

Similarly, although Galaxy's discovery responses were consistently slow and frequently incomplete, at least some of its discovery struggles can also be explained by the fact that the same first-time business manager was responsible for compliance. I note that when Ghnaim appeared for deposition as Galaxy's Rule 30(b)(6) witness, he was candid about his business practices and the records that he did or did not keep. Ghnaim Dep. Tr. at 229:2-232:9. I further note that although

plaintiff sought a court order permitting it to take that deposition out of time – which I granted (Dkt. No. 133) – it did not move for further discovery or discovery sanctions thereafter, seemingly preferring to keep this issue in reserve for use on summary judgment.

Defendant did not cross-move for summary judgment on willfulness. Nor would such a motion likely have been successful, given the evidence adduced by HBI. Precisely because that evidence is susceptible of more than one interpretation, however, I conclude that there is "a genuine issue for trial," *Anderson*, 477 U.S. at 249, precluding the entry of summary judgment as to willfulness in favor of the plaintiff.

### B. Plaintiff's State Law Claims

#### 1. Unfair Competition Under New York Common Law

As discussed above, New York law applies the same standards for claims of unfair competition as are applied to claims of trademark infringement, except that New York law requires bad faith or intent. *Fendi Adele v. Burlington Coat Factory*, 689 F. Supp. 2d at 598. Here, because HBI has not established that Galaxy knowingly or recklessly sold counterfeit RAW products, it has not established the *mens rea* required by state law, and summary judgment is not appropriate on this claim. *Innovation Ventures*, 176 F. Supp. 3d at 158.

#### 2. GBL § 349

Because a trademark infringement claim is generally not cognizable under GBL § 349, HBI must show that Galaxy's conduct caused "a specific and substantial injury to the public interest over and above the ordinary trademark infringement," *Diesel*, 2016 WL 96171, at *8; *DePinto*, 222 A.D.2d at 289, 635 N.Y.S.2d at 217. Here, the evidence does not support a finding of "substantial injury to the public interest" beyond the consumer "confusion and deception" that

"trademark laws generally seek to redress." *Coach*, 908 F. Supp. 2d at 436. Therefore, summary judgment is denied as to plaintiff's § 349 claim.

## IV.    CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED as to plaintiff's first and second claims alleging violations of the Lanham Act, but DENIED as to willful infringement. Summary judgment is likewise DENIED as to plaintiff's third claim under GBL § 349 and its fourth claim for unfair competition under New York common law. If plaintiff wishes to dismiss these claims, so that it can promptly move for summary judgment on damages on its Lanham Act claims, it should so notify the Court, in writing, no later than **October 7, 2019**. Otherwise, the Court will assume that the parties wish to try the remainder of the case.

This Opinion and Order disposes of the motion at Dkt. No. 135.

Dated:  New York, New York
        September 30, 2019

                                    **SO ORDERED**.

                                    _____
                                    **BARBARA MOSES**
                                    **United States Magistrate Judge**